IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **JOHN J. McDEVITT, JR.**<br>**23 Heather Way**<br>**Newtown Square, Pennsylvania  19073**<br>v.<br>**COUNTY OF DELAWARE, d/b/a**<br>**FAIR ACRES GERIATRIC CENTER,**<br>**340 N. Middletown Road**<br>**Media, Pennsylvania  19063**<br>**and**<br>**ANGELA FRATTARELLI**<br>**c/o County of Delaware Government Ctr. Bldg.,**<br>**201 W. Front Street, Room 220**<br>**Media, PA  19063**<br>**and**<br>**JOSEPH TRAVAGLINI**<br>**c/o County of Delaware Government Ctr. Bldg.,**<br>**201 W. Front Street, Room 220**<br>**Media, PA  19063**<br>**and**<br>**CHRISTINE KECK**<br>**c/o County of Delaware Government Ctr. Bldg.,**<br>**201 W. Front Street, Room 220**<br>**Media, PA  19063**<br>**and**<br>**SEPHANIE PHELAN**<br>**c/o Phelan Associates, LLC**<br>**350 Hancock Avenue**<br>**East Norriton, PA  19401**<br>**and**<br>**I. HOWARD LEVIN, MD**<br>**c/o Katz-Bennett-Levin Neurology Assoc., P.C.,**<br>**50 E. Township Line Road**<br>**Elkins Park, PA 19007** | **CIVIL ACTION**<br>**NO. 26-cv-2449** |

**<u>COMPLAINT</u>**

**<u>JURY TRIAL DEMANDED</u>**

1.      Plaintiff, Jack J. McDevitt, Jr. (hereinafter "Jack" or "Plaintiff") states as follows in support of his claims against Defendants, the Pennsylvania County of Delaware, d/b/a Fair Acres Geriatric Center (hereinafter "Fair Acres"), Angela Frattarelli (hereinafter "Frattarelli"), Joseph Travaglini (hereinafter "Travaglini"), Christine Keck (hereinafter "Keck"), Stephanie Phelan, RN (hereinafter "Phelan") and I. Howard Levin, MD (hereinafter "Levin")(collectively the "Defendants"):

## **INTRODUCTION**

2.      By any measure, Jack McDevitt, Jr.is an individual who, before his employer terminated his employment on May 10, 2024, lived a life that was a true heroic journey!

3.      Jack was born afflicted by 18p- deletion syndrome (Monosomy 18p), a rare genetic disorder (1 in 50,000 births) caused by a partial or full deletion of the short arm of chromosome 18.

4.      That condition results in a variable syndromes characterized by, in Jack's case, shorter stature, lower muscle tone (hypotonia), displaced hips some delayed milestones and some recognized mild cognitive impairment.

5.      While there is no cure for 18p- deletion syndrome and management thereof is tailored to the individual's specific symptoms, in Jack's case the circumstance he greeted at his birth was just a barrier that presented a challenge that he knew he could and would hurdle, leading to a wonderful life experience.

6.      With the help of his loving parents, Jack worked hard to overcome speechlessness until age four and then tackled his disability with physical therapy, speech therapy, and regular education supplemented by intermittent special education programs throughout his formative years.

7. That hard work let him graduate from Marple Newtown High School and then allowed him to drive himself to the Fair Acres Center to secure his first employment serving the County's elderly as an Accountant II employed by the wholly owned geriatric facility owned and operated by the Pennsylvania County of Delaware beginning on March 19, 2012 that would end by the hurtful, discriminatory actions of his employer and aided and abetted by the other Defendants named herein.

8. His hard work to overcome the challenges imposed on him from birth crashed that day and left him emotionally depleted.

9. This action for declaratory, injunctive, monetary and other appropriate relief is brought by Jack to redress intentional violations by his employer, Defendant Fair Acres and each of the other Defendants of rights secured to him by the laws of the United States of America and the Commonwealth of Pennsylvania is intended to redress the intentional unlawful actions of the Defendants and compensate Jack for the unlawful, intentional actions of the Defendants, individually and collectively.

10. It arises under the Americans With Disabilities Act of 1990, 42 U.S.C. §12111, *et seq.* [hereinafter "ADA"], (as amended by the Americans with Disabilities Act Amendments Act of 2008 ["ADAAA"]), the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ["Rehab Act"] as the Pennsylvania Human Relations Act ["PHRA"], 43 Pa. Stat. § 955 as well as the common law of the Commonwealth of Pennsylvania that disallows individuals from aiding and abetting unlawful, intentional discrimination.

**JURISDICTION**

11. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §12117, all of which provide for original jurisdiction of Plaintiff's claims arising under the laws

of the United States and over actions to secure equitable and other relief under the appropriate governing statutes.

12.     Pursuant to Rule 5.1.1 of the Local Rules of Civil Procedure of the United States District Court for the Eastern District of Pennsylvania that prohibits the averment of specific monetary damages, Plaintiff avers only that the amount in controversy exceeds the jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000) exclusive of interest and costs in accordance with the Local Rules of the District Court.

13.     Plaintiff has exhausted all administrative remedies and has taken all other steps necessary to bring this action before this Court, having (1) filed a timely Charge of Discrimination against his employer with the Equal Employment Opportunity Commission ("EEOC")[EEOC Charge No. 530-2024-06002  and having received the requisite Notice of Suit Rights on January 20, 2026 to bring this action before this Court and (2) filed a concomitant Complaint (PHRC Case No. 202400099 with the Pennsylvania Human Relations Commission and having the right to process a lawsuit thereunder after one year from its filing.

14.     All conditions precedent to the filing of this Complaint in accordance with the statutes cited herein and the common law of the Commonwealth of Pennsylvania have been satisfied.

## VENUE

15.     All actions complained of herein occurred within the jurisdiction of this Court and involve defendants who regularly do business within its jurisdictional limits.

16.     Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. §§1391(b) and 1391(c).

## THE PARTIES

**Plaintiff John J. McDevitt, Jr.**

17.    Plaintiff  is an adult individual residing within the jurisdiction of this Court at 23 Heather Way, Newtown Square, Pennsylvania.

18.    Plaintiff was born on July 5, 1990, and is currently 35 years of age.

19.    At all times applicable to the present Complaint, Plaintiff was an "employee" of Fair Acres as that term is defined in the applicable federal laws.

20.    As stated summarily above, Jack was born afflicted by 18p-deletion syndrome (Monosomy 18p), a rare genetic disorder caused by a partial or full deletion of the short arm of chromosome 18.  It results in a variable syndromes characterized by, in Jack's case, shorter stature, lower muscle tone (hypotonia), some delayed milestones and some recognized mild cognitive impairment.

21.    Aided by caring parents, Constance and John Sr. who greeted the challenges that their son would be facing with a determination to secure for him all the help he needed to be a productive part of the Delaware County community including his tiny stature, that he could not speak and even at the age of four years only had use of four of the forty-four (44) phonetic sounds.

22.    As soon as Jack was eligible, they enrolled him in private speech therapy sessions at the Crozer Hospital in Chester for sessions three times per week.

23.    His personal quest to overcome his disabilities actually permitted him to read even before he developed language skills.

24.    That reading helped prompt speech, but even today his ability speak without a pronounced hesitation continues.

25. Further. as he matured, HGH hormonal therapy injected every evening by his parents helped his physical growth.

26. These corrective modalities allowed him to enter pre-school at Our Lady of Peace, matriculate at the Saint Anastasia grade school through grades 1-5, and then to the Paxon Hollow Middle School with participation in the school's life skills program.

27. Learning to deal with everyday actions such as the use of a check book in that life skills program  led to his interest in accounting, an interest that then further fueled his success at Marple Newtown High School with honors while he regularly attended technical skills classes off campus to improve his accounting and computer skills. In fact, he achieved great success as a result of the technical training and was one of two students who received county wide awards for excellence in Management Information Systems and Business Data processing.

28. In addition, Jack undertook driver training and secured his driver's license which he employed, within the one-year anniversary of his finishing high school and his specialized training, to drive himself to the Fair Acres facility to present his resume in application for the open position of accounting clerk.

29. In turn, he was interviewed, tested and given an entry level accounting job as an Accounting Clerk II.

30. The job requirements of that position are attached hereto as Exhibit "A".

31. In the 12 following years in, Jack carried out all facets of that job without any criticism, any need for additional training, or any suggestion that he was not complete fulfilling all the responsibilities of the job to which he was assigned.

32. Tackling every day with his infectious upbeat demeanor, Jack was successful in every aspect of his assignments as an Accountant II.

**Defendant Fair Acres**

33.     During all times applicable to the present Complaint, Defendant Fair Acres was Jack's "employer" as that term is defined under the controlling state and federal statutes cited herein.

34.     According to its website, Fair Acres is a long term and short-term care facility for older citizens owned and operated by Delaware County, Pennsylvania. Its 210-acre campus is located at 340 N. Middletown Road, Media, Pennsylvania.

35.     The Fair Acres website heralds that it offers job seekers competitive compensation and the opportunity to make a difference while gaining great employment benefits.

36.     The website further boasts that it hires, trains and promotes employees without discriminatory intent, including not discriminating based on an employee's disability.

37.     Its actions as discussed in this Complaint, belie that boast.

**Defendant Angela Frattarelli**

38.     At all times applicable to the present complaint, Defendant Angela Frattarelli, was the HR Advisor/Manager whose office is located at the County of Delaware Government Center Building, 201 W. Front Street, Room 220, Media, PA.

39.     During the time applicable events in this matter, she directly affected of all employment related actions complained of herein relating to Plaintiff.

**Defendant Joseph Travaglini**

40.     At all times related to the present action, Defendant Joseph Travaglini was Jack's immediate supervisor.

41.   At no time during Plaintiff's employment did he or anyone else at Fair Acres provide Jack with any criticism and never suggested that Jack was not capable of performing the responsibilities assigned to him.

42.   Specifically, during Jack's tenure at Fair View before his termination of employment, Defendant Travaglini never suggested to Jack or anyone else employed by Fair View that Jack was not able to competently carry out the duties of the Accounting Clerk II position he held for twelve years.

**Defendant Christine Keck**

43.   At all times applicable to the present Complaint, Defendant Keck was the Director of Human Resources for the County of Delaware and was responsible for all aspects of employment decisions relating to employees of the County, including hiring, terms of employment and firing decisions made regarding the County employees.

44.   Upon knowledge, information and belief, Defendant Keck was responsible for assuring that HR representatives assigned to functions within the County of Delaware adhered to the mandates of local, state and Federal laws involving the employment process, including assuring that all decisions to terminate an employee's employment with the County were just and proper and not in violation of the state and federal laws governing discrimination.

45.   Upon information and belief, Defendant Keck was fully aware of the unlawful actions taken in denying Jack McDevitt access to the required interactive process of accommodation to his disability and perception that his falling at work rendered him unable to fully and successfully carry out the responsibilities of his assigned position at Fair Acres and knowingly permitted the unlawful conduct that led to Jack's termination to be affected by her subordinate, Defendant Frattarelli.

8

46.     Upon knowledge, information and belief Defendant Keck aided and abetted the unlawful, discriminatory and unwarranted actions that led to Jack losing his job after 12 years of fully carrying out the responsibilities of his position at Fair Acres.

**Defendant Stephanie Phelan, RN**

47.     At all times related to the averments in the present Complaint, Stephanie Phelan now employed as a employment-related consultant with Phelan Associates, LLC, located at 350 Hancock Avenue, East Norriton, PA, was hired as a contractor for the sole purpose of aiding and abetting the unlawful, discriminatory actions of the County of Delaware intended to terminate Plaintiff from his longtime employment with the County serving as an accounting clerk.

48.     In that role of employment related consultancy, Defendant is certified as an Advanced Legal Nurse Consultant (ALNC) and regularly employed to help direct institutions regarding the administration of employment practices related to legal mandates incorporated in state and federal statutes.

49.     Defendant Phelan was hired to guide the County, and in turn the examination of Plaintiff, regarding his return to work after sustaining injuries relating to falls at work caused by back problems. In that spectrum of her employment, Defendant Phelan directed Dr. Levin not to review Jack's physical ability to return to work after a short leave necessary to control the back spasms that caused him to fall, but rather directed Defendant Levin to find, without appropriate support, that Jack was not cognitively capable of carrying out the assigned duties that he had successfully completed each and every year of his employment with Fair Acres.

50.     Upon knowledge, information and belief Defendant Phelan directly aided and abetted the unlawful, discriminatory and unwarranted actions that led to Jack losing his job after 12 years of fully carrying out the responsibilities of his position at Fair Acres.

9

**Defendant I. Howard Levin, MD**

51.　Dr. I. Howard Levin, MD, is a Board-Certified Neurologist who at all times relevant to the issues presented herein was employed by Katz-Bennett-Levin Neurology Associates, P.C., 50 E. Township Line Road. Elkins Park, PA 19007.

52.　Defendant Levin was directed by Defendant Fair Acres to assist that institution and the other individual Defendants complete what Jack was led to believe was a clearance examination that would fully allow him to return to work in accordance with the schedule set by his doctor, Neurologist Christopher Reid, MD after his return from justified medical leave.

53.　Instead of carrying out his responsibility to clear Jack from leave caused by lower back instability, Defendant Levin adhered to the dictates of Fair Acres unlawful quest to remove Jack from its workforce conveyed to him by Defendants Travaglini and Phelan, those dictates based upon the unsupportable conclusion that Jack did not have the ability to carry out his job responsibilities because of a lack of cognitive ability.

54.　Upon knowledge, information and belief Defendant Levin directly aided and abetted the unlawful, discriminatory and unwarranted actions that led to Jack losing his job after 12 years of fully carrying out the responsibilities of his position at Fair Acres.

## STATEMENT OF APPLICABLE FACTS

55..　After twelve years of spotless employment as an accountant for the County d/b/a Fair Acres Geriatric Center, on September 13, 2023, Jack stumbled and fell at work as a result of severe back spasms and was taken to Riddle Memorial Hospital.

56.　Following his hospitalization, Jack received testing, medical treatment and physical therapy and was able to return to work on December 4, 2023, with the temporary restriction of no driving that was not an essential element of his job.

10

57.    After returning, Jack again suffered back spasms on January 12, 2024 that caused him to slump to his knees, an event witnessed by others in the workplace.

58.    He then turned to treatment with his personal neurologist Christopher Reid, MD who examined Plaintiff and sent him for an MRI.

59.    In an apparent reflection of her view of Jack having a perceived disability that would disallow him to continue in the workforce and wrongly claiming that Jack was absent from work without being placed on authorized leave, Defendant Frattarelli sent a letter to Jack on March 11, 2024, threatening him with possible termination and directing him to provide a statement regarding his return to work to avoid discipline.

60.    Following that, Defendant Frattarelli sent another letter to Jack on March 25, 2024, advising that she was wrong to accuse Jack of being on unauthorized leave and that Jack, in fact,  had been approved for medical leave. Nevertheless, forecasting her intention of terminating Jack based upon her false and unlawful perception that his two bouts of transient dizziness and falling rendered him as person with an additional disability that had to be cut from the Fair Acres workforce, she again threatened Jack that his job security was in jeopardy.

61.    On April 2, 2024, Jack was re-examined by Dr. Reid, who cleared him to return to work on or before April 23, 2024, with no restrictions other than Jack should not drive because of his dizziness brought on by his back spasms.

62.    After receiving that report from Dr. Reid, Defendant Frattarelli  wrote to Jack again on April 4, 2024, acknowledging Plaintiff's leave was an ADA approved accommodation with job protection for a temporary time period. She did not provide Jack with a chance to meet and discuss that he wanted to return to work without any other restrictions other than driving and that he could engage in a safe return to work on the basis of Dr. Reid's report.

11

63.    Again without granting Jack an audience to confirm that his perceived disability would not prevent his complete safe return to his sedentary position, Defendant Frattarelli wrote to him advising for the very first time that "[a]s a result of our objective observations of your performance in your job prior to medical leave, the County has a reasonable belief that your current medical condition is impairing your ability to perform some of the essential functions of your job." Frattarelli did not present any basis for her unfounded perception or reveal who was the source of the aforesaid "observations".

64.    It is asserted that the lack of any evidence supporting that espoused view and the failure to allow a meeting to allow an interactive discussion of what claims were being made to shape that perception of disability, together constitute discriminatory violations of the ADA, the Rehabilitation Act and the PHRA.

65.    Further, Defendant Frattarelli' s apparent refusal to meet with Jack was reflective of her intention to act on her unfounded perceptions of the asserted additional disabling condition of instability,  thereby disallowing a continuation of Jack's employment by Fair View.

66.    At the direction of Defendant Frattarelli acting on her unfounded belief that Jack was not able to fulfill the duties that he had done so successfully over 12 years of unblemished job performance, on April 29, 2024, Jack presented himself to the offices of Defendant Dr. Levin for a neurological fitness for duty examination.

67.    Defendant Levin prepared two reports dated the day of his examination. The first was a short two-page report that was entitled the REVIEW OF RECORDS.

68.    In that document, Defendant Levin acknowledged that Dr Reid had cleared Jack to return to work on April 23, 2024 with the only restriction being an admonition against driving, but stated without identifying the source of the information that an unnamed and unidentified

"supervisor" opined that Jack "was only able to accomplish 3 of 12 daily activities for his position…had no ability to work independently and [cryptically] was not asked to complete transactions for accuracy and deadlines…[and] also noted he only met 2 of his 13 job qualifications and was not qualified for the 11 others."

69. Again, without any analysis, definitive support or the underlying basis for his independent knowledge of Jack's duties, Defendant Levin concluded that Jack was not able to perform the essential functions of an Accounting II clerk in the finance department or that Jack could complete the tasks assigned to his position in a timely and accurate fashion despite Jack's 12-year successful completion of his duties, copying Defendant Frattarelli.

70. It is averred that the Defendant Levin's references of Jack's abilities as noted in his purported review of the records were directed and dictated by Defendant Frattarelli in support of the County's efforts to terminate Jack's employment and were not based upon any review of records examined by or observations made by Dr. Levin.

71. The REVIEW OF RECORDS report was combined with an equally disturbing FIT FOR DUTY MEDICAL EVALUATION that did not provide the basis for the conclusion made in his review of the records that Jack could not perform the very job he did for the12 previous years of his employment and was again the apparent result of only providing to the County a false basis of perceived disability that Jack could no longer do his job in the future.

72. On May 1, 2024, Defendant Frattarelli cancelled the third interactive discussion meeting scheduled for May 6, 2024, again denying a full discussion of any issues relating to Jack's fitness for the job.

73. Finally, on May 11, 2024, Jack was informed via email, without any informed basis therefore, that his employment with Fair Acres had been terminated.

## GENERAL CONTROLING PRINCIPLES OF LAW

74.    An aiding and abetting claim against a non-employer cannot stand against the third-party aider and abettor without an underlying violation of the terms of the ADA, the Rehabilitation Act or the PHRA by the employer.

75.    Accordingly, before resolving Plaintiff's claims against any third-party it must be determined whether Plaintiff has stated a viable claim against the employer for unlawful disability discrimination under any of the controlling statutes.

76.    The purpose of the ADA is to prevent otherwise qualified individuals from being discriminated against in employment based on disability. The Supreme Court has observed that the ADA "seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

77.    Under the ADA, no covered entity shall discriminate against a qualified individual with a disability because of the disability or the perception that a person suffers a disability that disallows that person to fulfill the obligations of his or her assigned position.

78.    Similarly, Section 955(a) of the PHRA recognizes that it is "an unlawful discriminatory practice...[f]or any employer because of… non-job related handicap or disability …of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required….

14

79.     The elements of a claim under the ADA, the PHRA and the Rehabilitation  Act have been held to identical standards in the context of the claims made herein.

80.     The Third Circuit has held that the PHRA is basically the same" as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts. The Unites States Court of Appeals for the Third Circuit and other circuit courts have also recognized that the same standards apply to the Rehabilitation Act.

81.     In order for Plaintiff to prevail in a claim for disability discrimination under the ADA, he only must show that he (1) has a "disability" or is "regarded as" having a "disability," (2) is otherwise a "qualified individual" able to perform his essential job duties, and (3) has suffered an adverse employment action because of that disability.

82.     A "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."

83.     To be a "qualified individual", Plaintiff simply must demonstrate that (1) he has the requisite skill, experience, education and other job- related requirements of his position; and (2) with or without reasonable accommodation, can perform the essential functions of such position.

84.     In the context of the matter presented herein, Plaintiff clearly has a qualifying disability long fully recognized by the employer manifested by disclosures made by the Plaintiff since the inception of his employment and based upon the apparent evidence of his delayed speech patterns suffered by Plaintiff since his birth.

85.     Here there was no dispute ever  raised by the Defendant that Jack was not qualified to do his job as an Accountant III.

86.    While discrimination under the governing statutes encompasses adverse actions motivated by prejudice and fear of disabilities, it also includes failing to make reasonable accommodations for a plaintiff's disabilities. Moreover, a failure to accommodate is a separately actionable 'unlawful employment practice' akin to wrongful termination or failure to hire.

87.    An employer's failure to reasonably accommodate the disabilities of an otherwise qualified employee constitutes an adverse employment action under the third element of the prima facie case of generic disability discrimination.

88.    While the failure to engage in the interactive process is not an independent violation of the ADA; it is a way in which an employee can demonstrate that an employer breached its duty to provide reasonable accommodations.

89.    An employer fails to engage in the interactive process when: (1) the employer knew about the employee's disability; (2) the employee requested a meeting to discuss his or her disability; (3) the employer did not make a good faith effort to assist the employee in allowing that interactive process to proceed.

90.    In the present matter, there is no dispute that Plaintiff has a qualifying disability, nor is there any dispute that his employer knew about that disability and that Plaintiff requested an accommodation from the employer that would have permitted him to return to work promptly after presenting the qualifying note from his doctor to do so.

91.    In the context of what constitutes good faith, the interactive process is aimed at determining what reasonable accommodations, if any, can address the employee's disability. It simply requires a great deal of communication between the employee and the employer.

92.    Like here, an employer can be found to discriminate against an employee with a disability by failing to fully engage in the interactive investigation of a workable

16

accommodation, in this case a full discussion of any perception that Plaintiff could not carry out the functions of his job.

93.   As here, an employer acts in bad faith when it obstructs or delays the interactive process, otherwise fails to help the other party determine what specific accommodations are necessary or fails to communicate by way of initiation or response.

94.   Once Jack requested the accommodation, the employer was required to engage in the interactive process.

95.   Thus, Jack was only required to demonstrate that he requested to promptly return to work after his doctor supported that result, thus triggering the interactive process.

96.   By failing to engage in the interactive process in good faith, assumed the risk of not accommodating his prompt return without a clear showing made during the interactive that such a result was not possible.

97.   In the present matter, Fair Acres did not meaningfully discuss with Jack an accommodation that would be available to him, failed to act in good faith in the interactive process and was responsible for the breakdown in that process which would have led to his prompt return to work.

98.   By failing to engage in the interactive process, Fair Acres violated the three controlling statutes prohibiting disability discrimination.

99.   Jack has also established he suffered the requisite an adverse discriminatory employment action when he was discharged on May 11, 2024.

**Aiding and Abetting Liability**

100.   Having established that Fair Acres acted unlawfully in failing to engage in the interactive process and caused the termination of his employment without lawful purpose, Jack is

now also  pursuing an aiding and abetting claim against those individuals named in this Complaint.

101.    To be liable for aiding and abetting, there must first be an underlying, primary violation by the employer.

102.    Under the aiding and abetting liability theory of liability brought pursuant to the aforecited  PHRA and the common law of the Commonwealth of Pennsylvania, a third party can be held liable for the taking of action prevent further discrimination by an employee.

103.    While  shared intent to discriminate between the employer and the aiding and abetting third parties is not required to hold any third party fully liable for a Plaintiff's damages arising from  the non-employer defendant's unsupportable unlawful conduct that aided and abetted Fair Acre's unlawful conduct.

104.    Pennsylvania courts apply the standards of aiding and abetting outlined in the Restatement of Torts, § 876(b) and have held that the aider and abettor and the employer need not share the same discriminatory intent.

105.    Simply stated, while a plaintiff is not required to demonstrate that his employer and the individual Defendants shared an intent to discriminate against him or her or to deny an accommodation, the factual underpinning here reflect that the named third parties were or reasonable should have been fully aware that the employer was attempting to fire Jack for a perceived inability to do his job based upon falling at work and did directly aid and abet in imposing that action.

106.    Simply stated, they knew about and either substantially assisted or encouraged the discrimination Plaintiff experienced.

## COUNT I

18

**(Violations of The Americans With Disabilities Act of 1990)**
**As amended by 42 U.S.C. §§ 12111-12117**

**Against Defendant Fair Acres**

107.    Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

108.    Defendant Fair Acres violated the ADA as amended by refusing to hold the required interactive meeting process which would have revealed the Jack had the requisite ability to do his job and discharging Jack on the pretext that he did not have the requisite cognitive ability to carry out the functions of the job he did for the previous 12 years.

**COUNT II**
**(Violations of the Pennsylvania Human Relations Act, 43 Pa. Stat. §955)**

**Against Defendant Fair Acres**

109.    Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

110.    Defendant Fair Acres violated the PHRA by refusing to hold the required interactive meeting process which would have revealed the Jack had the requisite ability to do his job and discharging Jack on the pretext that he did not have the requisite cognitive ability to carry out the functions of the job he did for the previous 12 years.

**COUNT III**
**(Violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*)**

**Against Defendant Fair Acres**

111.    Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

19

112. Upon information and belief, Defendant Fair Acres is a governmental unit entity that receives federal funding and is therefore subject to the Rehabilitation Act, 29 U.S.C. § 794(a).

113. As set forth above, Plaintiff was engaged in a protected activity, *i.e.*, requesting reasonable accommodations relating to his disability in order to continue performing his employment related duties satisfactory manner he had performed those duties for the twelve years prior to the termination of his employment with Fair Acres.

114. The actions of the Defendant were sufficient to deter a person of ordinary fitness from exercising  rights to continued employment for which he was fit and requesting accommodations for disabilities resulting in his discharge of employment with Defendant Fair Acres.

115. Accordingly, Defendants' actions violate Section 504 of the Rehabilitation Act.

## COUNT IV
### (Aiding and Abetting the Unlawful Discriminatory Actions of Defendant Fair Acres)

### Against Defendants Frattarelli, Travaglini, Keck, Phelan and Levin

116. Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

117. The actions of Defendants Frattarelli, Travaglini, Keck, Phelan and Levin, acting individually and in concert, aided and abetted the unlawful discrimination affected by Fair Acres as Jack's employer, and therefore, each are individually liable for the full amount of damages suffered by the Plaintiff as a result thereof.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff John J. McDevitt, Jr. respectfully requests that this Court:

(a)     Enter a declaratory judgment that Defendants' acts, policies, practices and procedures complained of herein have violated and continue to violate the rights of Plaintiff as secured to him by federal and state statutory law and the common law of the Commonwealth of Pennsylvania;

(b)     Enter judgment in favor of Plaintiff and against all Defendants.

(c)     Require the rehiring of Plaintiff as an Accountant II, with appropriate accommodations to any schedule necessary to treat his back conditions;

(d)     Award to Plaintiff and against each of the Defendants an appropriate monetary amount for all compensatory and consequential damages caused by the Defendants' refusal to accommodate Plaintiff's disability including all economic losses Plaintiff has suffered and will suffer as a result of the unlawful actions of Defendants in the future;

(e)     Award to Plaintiff and against each Defendant an appropriate monetary amount damages for emotional distress, humiliation,  loss of life's pleasures together with the physical manifestations of those conditions such as sleeplessness, constant headaches and stomach disorders suffered by Plaintiff as a result of the unlawful actions of each of the Defendants;

(f)     Award to Plaintiff and against each Defendant a monetary award in an appropriate amount for punitive damages for the malicious actions leading to the Plaintiff's discharge from employment;

(g)     Award to Plaintiff reasonable attorneys' fees and the costs associated with the pursuit of Plaintiff's claims; and

(h)     Grant to Plaintiff all other relief which the Court deems appropriate and proper under the circumstances.

21

**SPECTOR GADON ROSEN VINCI P.C.**

By:    /s/ *Alan B. Epstein*

Alan B Epstein, Esquire
PA. I.D. No. 2346
Jennifer Myers Chalal, Esquire
PA. I.D. No. 77841
One Logan Square, 18th Floor
130 N. 18th Street, Philadelphia, PA 19103
215.241.8888
215.241.8844 (Fax)
aepstein@sgrvlaw.com
jchalal@sgrvlaw.com

*Attorneys for Plaintiff*
*Plaintiff, John J. McDevitt, Jr.*

**OF COUNSEL**
Anthony Creato, Esquire
need Pa. I.D. No. ]
100 Four Falls Center, Suite 213
610.828.4555
610.940.4422 (Fax)

Dated:  April 14, 2026